**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RABBI DAVID SLOMOVITZ, NATHAN FRANKEL, EDWARD HANDLER, SAMUEL LANDY, MIRIAM LEVITZ, HARRY LIEBER, DAVID REICH, ABRAHAM TAUBER, and MORRIS WALDMAN,<br><br>                Plaintiffs,<br><br>          v.<br><br>THE ENCLAVE AT FAIRWAYS HOMEOWNERS ASSOCIATION, INC., a New Jersey Domestic Corporation,<br><br>                Defendant. | Civil No. |

**COMPLAINT**

Plaintiffs RABBI DAVID SLOMOVITZ, NATHAN FRANKEL, EDWARD HANDLER, SAMUEL LANDY, MIRIAM LEVITZ, HARRY LIEBER, DAVID REICH, ABRAHAM TAUBER, and MORRIS WALDMAN, by their undersigned attorneys, complain of Defendant, THE ENCLAVE AT THE FAIRWAYS HOMEOWNERS ASSOCIATION, INC., as follows:

**INTRODUCTION AND NATURE OF ACTION**

1.      The Plaintiffs are Orthodox Jewish persons who, over the last few years, have purchased single-family residences in The Enclave at the Fairways, ("The Enclave") a fifty-five and over gated community in Lakewood Township, New Jersey.

2.      Through a sustained campaign of targeted actions, including the building of a gate and fence inaccessible to the Plaintiffs, the Defendant The Enclave at the Fairways Homeowners

Association, Inc. ("HOA") has literally locked Orthodox Jewish residents within its borders, preventing them from attending religious worship services at nearby synagogues on the Sabbath and other Holy Days, while simultaneously prohibiting and fining Plaintiff Rabbi David Slomovitz from engaging in group prayer in their own homes, among other actions.

3.    As the number of homes owned by Orthodox Jews in The Enclave has increased over the last two years, the Defendant HOA has taken a concerted series of escalating actions targeting these Orthodox Jewish residents, including preventing them from leaving The Enclave to attend services on the Sabbath and Holy Days; preventing Orthodox Jewish residents from receiving visitors at their homes on such days; discriminatorily enforcing rules about visitors in a way that predominantly if not exclusively obstructs the families and friends of Orthodox Jewish residents from visiting on the Sabbath; discriminatorily enforcing rules to prevent Orthodox Jewish residents from gathering for prayer activity in their homes; and setting up a short-lived volunteer security force whose function was to wait at a gate to challenge and question Orthodox Jewish residents returning home from religious services on Friday nights and Saturdays.  These actions target the Orthodox Jewish residents of The Enclave because of their religion, disparately impact Orthodox Jewish residents, and interfere with the exercise of their fundamental right to religious freedom.

4.    This Action is commenced to redress violations of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* ("FHA"), 42 U.S.C. § 1982, the New Jersey Constitution's protection of religious exercise, the New Jersey Law Against Discrimination ("LAD"), and the Planned Real Estate Development Full Disclosure Act, N.J.S.A. 45:22a-21, *et seq.* ("PREFDA").

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(3), (4) and 42 U.S.C. § 3613(a), *et seq.*, which confer original jurisdiction on federal district courts in suits to redress the deprivation of rights, privileges and immunities secured by the Fair Housing Act.

6.      This Court has jurisdiction over Plaintiffs' request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

7.      This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the acts and transactions complained of occurred, and continue to occur in this District.


## THE PARTIES

9.      Plaintiff RABBI DAVID SLOMOVITZ resides at 244 Enclave Boulevard, Lakewood, New Jersey, is a homeowner in The Enclave, and is a member of The Enclave at the Fairways Homeowners Association, Inc.

10.      Plaintiff NATHAN FRANKEL resides at 551 Bennington Lane, Lakewood, New Jersey, is a homeowner in The Enclave, and is a member of The Enclave at the Fairways Homeowners Association, Inc.

11.      Plaintiff EDWARD HANDLER resides at 118 Enclave Boulevard, Lakewood, New Jersey, is a homeowner in The Enclave, and is a member of The Enclave at the Fairways Homeowners Association, Inc.

12.     Plaintiff SAMUEL LANDY resides at 192 Enclave Boulevard, Lakewood, New Jersey, is a homeowner in The Enclave, and is a member of The Enclave at the Fairways Homeowners Association, Inc.

13.     Plaintiff HARRY LIEBER resides at 52 Kristin Court, Lakewood, New Jersey, is a homeowner in The Enclave, and is a member of The Enclave at the Fairways Homeowners Association, Inc.

14.     Plaintiff DAVID REICH resides at 126 Enclave Boulevard, Lakewood, New Jersey, is a homeowner in The Enclave, and is a member of The Enclave at the Fairways Homeowners Association, Inc.

15.     Plaintiff ABRAHAM TAUBER resides at 611 Quail Court, Lakewood, New Jersey, is a homeowner in The Enclave, and is a member of The Enclave at the Fairways Homeowners Association, Inc.

16.     Plaintiff MORRIS WALDMAN resides at 49 Enclave Boulevard, Lakewood, New Jersey, is a homeowner in The Enclave, and is a member of The Enclave at the Fairways Homeowners Association, Inc.

17.     Plaintiff MIRIAM LEVITZ resides at 330 Damiano Way, Lakewood, New Jersey, is a homeowner in The Enclave, and is a member of The Enclave at the Fairways Homeowners Association, Inc.

18.     Defendant, THE ENCLAVE AT THE FAIRWAYS HOMEOWNERS ASSOCIATION, INC., is a domestic corporation of the State of New Jersey, having offices at 65 Enclave Boulevard in the Township of Lakewood, in the State of New Jersey. Its operations are governed by, *inter alia*, the New Jersey Planned Real Estate Development Full Disclosure Act.

## FACTUAL ALLEGATIONS

19.     The Enclave is an active adult over age 55 community located in Lakewood, Ocean County, New Jersey.

20.     Constructed in 2005 and completed in 2012, The Enclave consists of 348 single-family condominium homes, a clubhouse, and a pool.

21.     The Enclave is governed by The Enclave at the Fairways Homeowners Association, Inc. ("the HOA"), created by, among other things, a Declaration of Covenants and Restrictions (the "Declaration"), recorded in the Office of the Ocean County Clerk on August 23, 2004, in Deed Book 12227, Page 1105, as amended.

22.     In February 2016, only one Orthodox Jewish family resided in The Enclave.

23.     Since that time, many other homes in The Enclave have been purchased by Orthodox Jews.  There are approximately one hundred and twenty homes in The Enclave owned by Orthodox Jews.

24.     Each homeowner in The Enclave is subjected to regulation by the HOA.

25.     In recent years, a wave of anti-Semitic hostility has targeted Orthodox Jews in and around Lakewood Township and surrounding jurisdictions including the Township of Howell, Toms River, and Jackson Township.

26.     There is a significant amount of anti-Semitic animus harbored by many local residents in this area, including residents of The Enclave.

27.     Lawsuits have been filed challenging the actions of local Townships that have targeted the Orthodox Jewish population.  *See Agudath Israel of America v. Jackson Township,* 3:17-cv-03226-MAS-DEA (D.N.J. filed May 8, 2017); *Congregation Kollel, Inc. v. Twp. of Howell & Howell Twp. Zoning Bd. of Adjustment,* No. 16-2457, 2017 WL 637689 (D.N.J. Feb.

16, 2017); *Oros Bais Yaakov High School v. Twp. of Jackson & Jackson Twp. Zoning Bd. of Adjustment,* PW-L-2981-14 (N.J.  Super. Ct. Law Div. 2017); *Chabad Jewish Ctr. of Toms River, Inc. v. Twp. of Toms River*, No. CV31601599FLWLHG, 2018 WL 1942360, at *1 (D.N.J. Feb. 5, 2018).

      28.    Plaintiffs and other Orthodox Jewish residents of The Enclave have been targeted by this same hostility by the HOA and other residents.

      29.    On April 2, 2018, the Asbury Park Press published a story about the "dramatic turnover" at The Enclave "as Orthodox Jewish home buyers move in."  The article reported that "[m]any non-Orthodox residents . . . say they are convinced there's a concerted effort to 'take over' The Enclave."  Comments to the story included the following:

      a.    This is very disturbing. It's not bad enough that the Orthodox have destroyed Lakewood, now they want to take over all the border towns and destroy them. . . . I am also very sad to see that all the towns are caving in to these people. By the way, the Orthodox person who wants to make a few 'tweaks' to the rules is a lot of B.S. They plan on taking over, and most likely will.

      b.    The thing is, if you don't cave in and/or say no your considered "Antisemetic", then they sue the towns. I live in Jackson on the west side, so it's not too bad here but going anywhere else in town...its getting nuts. They are just knocking on doors with bags of cash hoping you say yes. I could right a book literally of everything going on.

      c.    I am sad for anyone that is forced to leave their home and community because they find that their interests and way of life are not protected. This really is un American! The problem with the Lakewood religious community is that they don't want to coexist nor do they want to be fully self supported by those within their religion; think Vatican City and everyone that lives/works there supported by the Catholic community, not taxpayers.

      d.    This town is getting out of control. It needs to stop. Our Governor needs to step up and do something. Who are these people??

      e.    If they wish to move into age restricted community, why not build a new one strictly for their needs and leave the other adult communities alone! That would solve the problem. If they have to

money to move from Brooklyn and spend $540k on a house, then they have the money to build their own community! Stay out of ours!

f.  This is all sickening to me. I watch Vermont Ave in Toms River and I think of how many people who thought they bought their dream home are now being forced to sell their home. No one is fooled here. If the Jewish community is moving into your area, it's over.

30.  Plaintiffs and members of their families have also experienced significant anti-Semitic hostility from residents of the Enclave.

31.  In 2018, Plaintiff Rabbi Slomovitz's son-in-law went over to my neighbor's house to speak to him. His neighbor then told his son-in-law, "You don't want to speak to me. I'm your worst nightmare."

32.  During the summer of 2017, Plaintiff Levitz noticed two gentlemen sitting in front of her residence. When she asked them what they were doing, they replied that they were watching the gate, which indicated to her that they were monitoring the neighborhood for the entrance of Orthodox Jewish residents and their family and friends.

33.  On November 24, 2018, Plaintiff Waldman was coming back from services at the Elmwood synagogue when an Enclave resident and his son started yelling hostile and anti-Semitic comments to him at the Damiano exit.  They yelled "you're supposed to use the Massachusetts Avenue gate" when a woman who was driving through the Damiano gate gestured for Plaintiff Waldman to go in.  They then continued with "You have no right to come through here"; "You must go through Massachusetts Way";  "This place is becoming a zoo"; and "Fucking Jews."

34.  The son cursed at Plaintiff Waldman and his wife, made a dirty look and made an obscene gesture through the sunroof of his car in the presence of  Plaintiff Waldman's wife.

35.     On or about February 25, 2017, Plaintiff Waldman held a prayer meeting at his house.  Anyone who came out of his house was harassed and followed.  Enclave residents took photos of them.

36.     A neighbor told Plaintiff Handler and his wife they had no right to walk on the sidewalk, indicating it was due to them being Orthodox Jews.

37.     Another resident told the granddaughter of Plaintiff Handler that she did not have the right to be in The Enclave for the same reason.

38.     One resident yelled at the grandchildren of Plaintiff Reich and took pictures of them while they were visiting him.

39.     When the son and grandchildren of Plaintiff Landy visited him in the Fall of 2017, they were accosted by an Enclave resident who yelled at them for coming into The Enclave because they were Jewish.

40.     During the course of traditional Christian holidays, residents of the Enclave can and do decorate their homes and the Clubhouse at the Enclave with holiday decorations.

41.     However, several of the Plaintiffs had to apply for a permit from the Enclave HOA to place a Sukkah on their properties to observe their religious holiday.

42.     The permit is in a very bright color with large lettering and must be placed on the front of the Plaintiffs' homes.

43.     Plaintiffs find this extremely offensive and a deliberate attempt to indicate to the neighborhood that they are Jewish.

44.     This year, the Enclave had a candle lighting ceremony for Hanukkah.  All of the residents received the email from the HOA indicating that a "pickleball" event was cancelled due

to the Hanukkah ceremony.  This was a deliberate attempt to heighten tension and hostility toward the Orthodox Jewish residents of The Enclave.

45.     An employee of The Enclave was also discharged and banned from The Enclave when he refused to promise not to say that he believed the HOA was discriminating against Orthodox Jewish residents.

46.     This anti-Semitic hostility has culminated in an orchestrated and deliberate attempt by the HOA to prohibit Plaintiffs and other Jewish residents of the Enclave from attending their religious services.

47.     Orthodox Jews believe that their religion requires that they may not use cars or electronic devices (including phones or electronic access keys) during the Sabbath, which commences twenty minutes before sundown on Friday and ends approximately one and a half hours after sundown on Saturday.

48.     They also have a religious obligation to attend services on the Sabbath.

49.     These same conditions apply on several Holy Days occurring throughout the calendar year.

50.     Although not permitted to utilize electronic devices during the Sabbath and Holy Days, Orthodox Jews are permitted to use mechanical combination locks, which can be affixed to gates.

51.     The Enclave has two entrances, one on Massachusetts Avenue ("Massachusetts exit") and another at the intersection of Damiano Way and Cross Street ("Damiano exit").

52.     Both entrances have video surveillance cameras maintained by the HOA.

53.     There are several synagogues or *shuls* where Orthodox Jews may attend services within walking distance of the Damiano exit.

54.     Plaintiff Morris Waldman attends Congregation Presidential Estates on Ford Avenue and Bais Medrash of Elmwood Village located at 2 Tova Drive, both in Lakewood, New Jersey.

55.     Plaintiff Edward Handler attends Congregation Presidential Estates on Ford Avenue in Lakewood, New Jersey.

56.     Plaintiff David Reich attends Bais Medrash of Elmwood Village located at 2 Tova Drive and the Finchley Synagogue located at 55 Finchley Boulevard, both in Lakewood, New Jersey.

57.     Plaintiff Samuel Landy attends Hearthstone Synagogue at 911 Hearthstone Drive, which is located in Lakewood, New Jersey.

58.     Plaintiff Harry Lieber attends Beth Midrash Elmwood Village Synagogue located at 2 Tova Drive, Lakewood, New Jersey.

59.     Plaintiff Nathan Frankel attends Chestnut Shul, located at 105 Chestnut St, Lakewood, NJ 08701.

60.     Plaintiff Abraham Tauber attends Bais Medrash of Elmwood Village, located at 2 Tova Drive, Lakewood, New Jersey.

61.     The Massachusetts Avenue entrance, on the other hand, is an additional half-mile distant from such synagogues and requires walking in the dark on unlit roads with no sidewalks.

62.     Plaintiffs, all over 55 years of age, cannot travel to these synagogues using the Massachusetts exit.  Such a trip on foot would also be extremely unsafe.

63.     The Enclave has a gate on Massachusetts Avenue.

64.     When The Enclave was constructed, a pedestrian gate was installed at the Damiano exit ("Damiano pedestrian gate").

65.     Upon information and belief, from the date of its installation until March 2016, the Damiano pedestrian gate remained unlocked, a period of approximately eleven years.

66.     In March 2016, Orthodox Jewish residents of the Enclave began to use the pedestrian gate at the Damiano exit to leave The Enclave and walk to services at the nearby synagogues.

67.     In direct response to this, in March 2016, the HOA for the first time began locking the Damiano pedestrian gate.

68.     In the Summer of 2017, the Damiano pedestrian gate was permanently locked, with access only permitted for ingress and egress from The Enclave with an electronic card provided to Enclave residents.

69.     After a threat of a lawsuit, the HOA reopened the gate for only specific times of the day.

70.     The times that the Damiano pedestrian gate was locked greatly interfered with the schedule of prayers, creating a tremendous burden for the Orthodox Jewish residents.

71.     Until approximately mid-2016, the entire Enclave property, including the area around the Damiano entrance, was surrounded solely by a low two-rail fence.  The following photo shows this fence:



72.     Persons could easily pass such fence by climbing between or over the rails.

73.     Recently, the HOA has now constructed an approximately eight-foot-high solid fence adjoining the Damiano exit, making it impossible to cross the fence.

74.     Except for the area immediately around the Damiano entrance, the rest of the border of The Enclave still only has the low, easily crossable, two-rail fence.

75.     The only place where people cannot pass the The Enclave's fences is the one place Orthodox Jews use to attend Sabbath and other holiday services, or where their family members may access The Enclave to visit residents.

76.     The following photo showS the pedestrian gate after the erection of the fence.



77.     In an effort to attend Sabbath services, some Orthodox Jewish residents of the Enclave walked around the high fence on the Sabbath on November 23 and 24, 2018.

78.     In direct response to this attempt to attend worship services, the HOA immediately extended the high fence.  The following photo shows the fence being extended on November 26, 2018.



79.     The HOA announced on or about November 2018 that it is installing metal "skirts" on the auto gate barriers on the Damiano exit, to prevent pedestrians from ducking under the auto gate as well.

80.     None of these steps have been taken around the Massachusetts Avenue gate or the rest of The Enclave.

81.     After being informed of Plaintiffs' rights, the HOA opened the Damiano pedestrian gate 4:00 p.m. to 8:00 p.m. on Friday night and from 6:00 a.m. to 10:00 a.m. on Saturday morning. These hours were significantly more restricted than Orthodox Jewish homeowners need and had requested.

82.   Plaintiff Levitz purchased her particular residence in November 2016 because it is immediately adjacent to the Damiano exit and living there would allow her to spend weekends and holidays with her children and grandchildren who live nearby.

83.   Plaintiff Levitz's daughter and family live outside the Enclave on Elmhurst Road, and her son and his family live outside the Enclave in nearby Chesterfield, locations which are both within ten minutes' walking distance from the Damiano exit.

84.   Plaintiff Levitz's residence location is also within walking distance of her son and daughter's synagogues, where she planned to attend with them upon purchase of her home.

85.   Even though Plaintiff Levitz is a homeowner in the Enclave, she has generally not used her home as a residence since moving there because the pedestrian gate at Damiano Way was locked during some of the hours her husband and she attended synagogue, and when she purchased the home, the gate was not and had never been electronically locked.  It was also impossible for her husband to move his body over or under the automobile gate at the Damiano Way exit.

86.   It was further impossible for her husband to take the Massachusetts Avenue exit out of The Enclave since he uses a walker for distances greater than twenty-five feet, and that route creates an approximate 1.2-mile detour on unpaved roads with no sidewalks, several hills, and poor lighting.

87.   Plaintiff Frankel attends the Chestnut Shul, which is a ten-minute walk from the Damiano exit.

88.   When Plaintiff Frankel purchased his home in August 2017, the Damiano pedestrian gate was not locked.  This was the most important factor in his decision to purchase his home, since he knew he could attend synagogue on the Sabbath by exiting the Enclave through the gate.

89.     A few weeks after Plaintiff Frankel moved in, the Enclave locked the Damiano pedestrian gate on the Sabbath.  This forced him to bend under the gate in order to attend synagogue, which was physically difficult and humiliating, especially given that he is a homeowner in the Enclave.

90.     Plaintiff Frankel had children, nieces, and nephews living in surrounding neighborhoods who are also prohibited from visiting on the Sabbath because of the gate's hours of opening and closing on the Sabbath.

91.     Plaintiff Tauber attends the Elmwood Village Shul, which is a five-minute walk from the Damiano exit.

92.     Since Plaintiff Tauber has lived there, the Enclave has locked the pedestrian entrance to the Damiano Way gate during the Sabbath and Holy Days.  Plaintiff Tauber previously bent under the barrier to attend the Elmwood Village Shul.  Since the barrier was extended several weeks ago, for the last several Sabbaths, he has been unable to slip under the barrier.  He was unable to climb over the side of the fence because the Enclave installed a high wall preventing such action.

93.     It is now exceedingly difficult for Plaintiff Tauber's daughter and granddaughter to visit on the Sabbath or other Holy Days.  They are unable to leave The Enclave when the gate is locked at 10:00 a.m.

94.     Attempts by Plaintiff Tauber's daughter and his two grandchildren to exit the Enclave after that hour have been dangerous.  For example, one day they waited for a car to enter the Enclave so that the automobile gate would open and they could exit. They were then forced to rush out when a car entered with a group of other Orthodox Jewish parents and children waiting at the automobile gate for the same reason.  This was chaotic and unsafe for everyone involved.

Later that day, they attempted to enter The Enclave and they were unable to do so because the pedestrian gate was locked.

95.     Plaintiff Tauber was also required to obtain a permit in order to build and keep a Sukkah at his residence during the Jewish Sukkot holiday in September 2018.  He was required to place this permit--which was a brightly colored, eight-by-eleven sheet of paper--in his front window.  This was demeaning and offensive, especially when other residents are not required to obtain permits in order to decorate for the Christmas and Easter holidays.

96.     Another resident normally leaves The Enclave during the Sabbath and visits the sick at Chateau Rehabilitation Center but has been unable to because of the hours the pedestrian gate was open.

97.     Another resident and his family celebrated a grandchild's Bar Mitzvah outside The Enclave on Saturday and returned in the afternoon when the pedestrian gate was locked.  The husband, his wife, his married children, and his grandchildren were forced to climb over the fence.

98.     Prior to the skirts being placed on the Damiano exit gate, Plaintiff Reich had to "limbo" under the gate to walk out of the Enclave to services and then only if his children assisted him and held the gate up.

99.     Due to the locked Damiano pedestrian gate hours and the skirts that have been placed under the Damiano exit gate, Plaintiff Reich can no longer attend religious services for the entire duration as there is not sufficient time to attend services and return at the times designated by the HOA.

100.    Plaintiff Reich's children and grandchildren, who are in strollers, do not visit him if the Damiano pedestrian gate is closed, as the alternative route to the Massachusetts exit has no sidewalks, high grass, and is an unsafe and significantly longer walk.

101.    On the weekend of June 15, 2018, Plaintiff Lieber attended a religious service at the River Terrace Hall, located at 1106 River Avenue, Lakewood, NJ 08701, and returned to find the Damiano pedestrian gate locked.  He had to climb under the bar blocking the vehicle gate to get to his home.

102.    This occurred again on August 4, 2018.  After this second occasion of climbing under the bar, Plaintiff Lieber stopped attending religious services at his two Synagogues.

103.    Plaintiff Lieber fears not being able to return to my home if he continues to attend services at his Synagogues.

104.    Prior to installation of the skirts under the Damiano exit gate, Plaintiff Landy would bend underneath the gate to leave The Enclave for religious services.

105.    Plaintiff Landy did this for a year and a half despite his age of 68 years. This was painful on his back.

106.    Prior to the HOA's installation of the skirts under the Damiano Way gate, Plaintiff Waldman would climb under the gate to leave The Enclave to attend services at his synagogues.  With the skirts, he cannot fully attend services because he must make sure he returns before the gate is locked and closed.

107.    Prior to installation of the skirts being placed under the Damiano exit gate, Plaintiff Handler would bend under the gate to leave The Enclave to attend services at his synagogue.  It was too difficult to climb over since he had a hip replacement a few years ago.

108.    With the installation of the skirts at the gate, Plaintiff Handler can no longer attend services at his synagogue.  He cannot walk the distance using the Massachusetts exit.

109.    The son and granddaughter as well as great-grandchildren of Plaintiff Handler have been unable to visit him if the Damiano pedestrian gate is locked.  They cannot climb over the gate with their stroller.

110.    In addition, other Jewish residents of the Enclave have experienced the following:

    a.   The visiting grandchildren of three other resident couples were also forced to climb over the pedestrian gate.

    b.   Another resident returning from Saturday morning prayers waited for a car to drive through the auto gate and quickly followed it into The Enclave.

    c.   Guests of another resident couple were forced to navigate the fence.

    d.   The adult daughter of another resident couple was forced to climb over the pedestrian gate.

    e.   Another resident couple was unable to visit their children outside The Enclave.

111.    Shortly after moving to The Enclave in late 2016, resident Nathan Reiss walked out of the community on the Sabbath and was stopped by at least three individuals in cars.  He was given visibly dirty looks or told outright that he did "not belong [t]here."

112.    In June 2018, Plaintiff Reich hosted a social gathering outside the Enclave at Glatt Gourmet - River Terrace behind the Bais Medrash of Elmwood Village.  Approximately sixty to seventy residents of The Enclave had to bend underneath the automobile gate in order to leave The Enclave and attend the gathering.  Some residents were unable to attend because they could not bend under the gate.

113.     At an HOA meeting in the summer of 2017, a female resident at an open forum starting screaming that she did not want Jewish children in the Enclave.  There were no attempts to stop her, neither from the HOA board nor other meeting participants. An Orthodox Jewish

19

resident then explained that due to the large growth of young Orthodox families in Lakewood, many retiring grandparents were moving to Lakewood and the Enclave in particular and that the residents therein must learn to live together in harmony. When he finished speaking, he was greeted by a chant of "boo, boo" by a large group of people.

114.   The same woman who screamed at the HOA meeting approached Reiss in his car on another occasion and spat at him.

115.   During the summer of 2017, the children of another Orthodox Jewish resident rented a house in Elwood Village, a housing development a block away from the Damiano Gate. On numerous occasions they wanted to come visit him on Saturday afternoon but did not as it was too difficult to maneuver under the gate with a baby carriage. It was also extremely difficult for his daughter-in-law to bend in a dress and wig under the gate.

116.   Also, on at least six occasions during the summer, that resident ate at the home of his children on the Sabbath.  On those occasions, he was physically unable to bend under the gate, and he barely managed to wedge himself between the two gates.

117.   The same thing happened at least three times the following winter when he attended Chestnut Shul, Bais Medrash of Elmwood, and Yeshivas Ohr Yissachor—synagogues and shuls outside the Enclave. This space has since been blocked.

118.   The resident was precluded from eating at his friends' home outside the Enclave on the Sabbath when the Damiano Gate was locked.

119.   The HOA also organized a short-lived volunteer neighborhood watch composed of homeowners whose function was to wait at the Damiano exit during the Jewish Sabbath and challenge pedestrians attempting to enter The Enclave.

120.    These actions of the HOA with respect to the Damiano entrance and Damiano pedestrian gate were motivated by hostility toward Orthodox Jews and serve no other purpose but to interfere with Orthodox Jewish homeowners' travel to Sabbath services and to harass them in the practice of their religion.

121.    These actions of the HOA only impact Orthodox Jewish residents of The Enclave.

122.    These actions of the HOA prevent Orthodox Jewish residents of the Enclave, including the Plaintiffs, from attending worship services on the Sabbath and having family members visit them on such days.

123.    In October 2017, Plaintiff David Slomovitz began inviting Orthodox Jewish residents to gather in the basement of his home for prayer meetings.  These meetings would occur each week on Friday nights and Saturday mornings.

124.    On January 23, 2018 the HOA sent Plaintiff David Slomovitz a "Notice of Violation," stating that his practice of inviting other Orthodox Jewish people to morning and evening prayers in his basement constituted "using the basement of the home as a corporate place of worship in violation of the requirement to use the Home only for residential purposes."

125.    The letter imposed $25.00 per day fines on Rabbi Slomovitz, deactivated his access card for entry to the Enclave, suspended his membership rights and threatened other steps.

126.    Such fines have totaled approximately $7,700.

127.    Because of the deactivation of Plaintiff Rabbi Slomovitz's access card, he was unable to enter his home in The Enclave as a resident.  Instead, he was forced to enter as a guest.

128.    As a result, he could not enter The Enclave from either the Damiano Way or the Massachusetts Avenue entrances; he had to enter through the twenty-four hour manned guard

house where guests arriving by car check in.  This required him to wait in line with other guests arriving by vehicle.

129.     When Plaintiff Rabbi Slomovitz's married children come to visit him by car, they were required to check in at the twenty-four hour manned guard house and tell the attendant his name.  On a recent visit, the word "Jew" was written next to Plaintiff Rabbi Slomovitz's name in the computer system for the Enclave.

130.     On another occasion in 2018, Plaintiff Rabbi Slomovitz's children left The Enclave before midnight and when they returned after midnight, the attendant would not let them back in.

131.     When Plaintiff Rabbi Slomovitz's children and grandchildren came to visit by foot, they had to bend under the Damiano Way entrance. Now they are unable to use that entrance because of the skirts installed underneath the auto gate.

132.     Because of the suspension of Plaintiff Rabbi Slomovitz's membership, the HOA has forbade him from erecting a Sukkah on his property.  He was also prohibited from using the clubhouse, exercise room, or pool.

133.     HOA's bylaws do not prohibit a so-called "corporate place of worship," nor do they define it.

134.     Under New Jersey law, incidental religious activity at the residence of a member of the clergy does not transform its residential use.  *See State v. Cameron*, 100 N.J. 586 (1985); *Farhi v. Commissioners of Deal*, 204 N.J. Super. 575 (1985).

135.     Upon information and belief, the HOA has previously allowed people of other faiths to have religious gatherings in their homes.

136.     On October 12, 2018, the HOA proposed an amendment to its Bylaws prohibiting "regular meetings, presentations, assemblies or quasi-public gatherings," which was targeted to

prohibit Orthodox Jewish prayer meetings such as that which Plaintiff Rabbi Slomovitz had been conducting.

137.    An amendment of the Bylaws requires an affirmative vote of two-thirds of the homeowners, the proposed amendment failed to receive the necessary votes from homeowners.

138.    The HOA has also begun enforcing a previously unused and unenforceable policy with regard to pedestrian visitors to The Enclave (the "Visitor Policy"), requiring them to be accompanied by residents at all times they were inside The Enclave gates.

139.    The Visitor Policy targets the Plaintiffs by preventing visits by the relatives and friends of Plaintiffs and other Orthodox Jewish residents, since they are unable to contact the residents by phone during the Sabbath and Holy Days to come to the gate and escort them.

140.    The Visitor Policy does not apply to visitors in cars.

141.    The Visitor Policy has the intended effect of preventing family visits to Orthodox Jewish residents during the Sabbath and Holy Days.

142.    The Visitor Policy has also been changed in a way that further specifically inhibits Orthodox Jewish residents from having guests.  Previously, a homeowner could grant permission for visitors to temporarily access the property by informing the front gate.  This access included overnight visits.

143.    The HOA changed the Visitor Policy to limit such temporary permission for one day only and it expires at midnight each night.  This restriction poses an undue and targeted burden upon Orthodox Jewish homeowners who cannot call the gate to reactivate permission over the Sabbath.

144.    The HOA has also forbidden a women's yoga class gathering at the clubhouse requested by an Orthodox Jewish woman since Orthodox Jewish belief regulates certain kinds of

garb that women may wear in the presence of men.  The HOA stated that its activities must be made available to all residents regardless of gender.

145.    However, upon information and belief, the HOA has permitted meetings of men-only groups at the clubhouse in the past, such as the "Men's Club" which holds male-only meetings in the Enclave Clubhouse, and the Da Vinci club, which meets monthly in the Enclave Clubhouse.

146.    Several of these issues were addressed in a proceeding conducted by the New Jersey Attorney General's Division of Civil Rights, which investigated a complaint that the HOA was discriminating on the basis of religious belief in violation of the federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*, and the New Jersey Law Against Discrimination, N.J.S.A. §§ 10:5-1, *et seq.*

147.    The Plaintiffs are not parties to that complaint.

148.    After negotiating a settlement agreement with the DCR, the HOA refused to sign it, exposing the HOA to suit by the New Jersey Attorney General and/or by the United States.

149.    This long list of actions constitutes an ongoing pattern and practice of discriminating against Orthodox Jewish residents, interfering with and obstructing their protected rights, and harassment in their reasonable practice of their religion with the same freedom that others enjoy.

## COUNT I

### Fair Housing Act

### 42 U.S.C. § 3604(b)

150.     Plaintiffs repeat and reallege paragraphs 1 through 149 as if fully set forth herein.

151.    The actions by Defendant in violation of the Plaintiffs' housing rights in the provision of services or facilities in connection with the sale or rental of a dwelling based upon the

Plaintiffs' Jewish religion and race constitutes discrimination on the basis of race and religion in violation of 42 U.S.C.§ 3604(b).  They have resulted in and continue to result in a disparate impact and/or disparate treatment upon the Plaintiffs.

152.    The Plaintiffs have sustained and continue to sustain direct injuries including, but not limited to, being barred from the full use and enjoyment of the subject property, as guaranteed by the Fair Housing Act.

153.    The Plaintiffs have suffered deprivation of the statutory rights, emotional distress and mental anguish, embarrassment, humiliation and intimidation sustained as a result of Defendant's discriminatory actions.

## COUNT II

### Fair Housing Act

### 42 U.S.C. § 3617

154.    Plaintiffs repeat and reallege paragraphs 1 through 153 as if fully set forth herein.

155.    The  Defendant has intentionally harassed, intimidated and interfered with the housing rights of Plaintiffs in violation of the Fair Housing Act, 42 U.S.C. § 3617, through an ongoing series of intentional actions, including but not limited to:   (a) preventing Plaintiffs' religious practices by obstructing their movement in and out of the Enclave to their house of worship; (b) deliberately constructing and systematically fortifying a growing series of physical barriers to obstruct Orthodox Jewish homeowners and families, including Plaintiffs, from attending religious services; (c) refusing to provide a means for the Orthodox Jewish homeowners and their families, including Plaintiffs, to pass through the fortified barrier on the Sabbath and religious holidays in a manner that is permitted by their religious practices; (d) discriminatorily

enforcing the Associations' Rules; and (e) attempting to impose new rules to further obstruct Orthodox Jewish prayer and observances.

156.    The Plaintiffs have sustained and continue to sustain direct injuries including, but not limited to, being barred from the full use and enjoyment of their property, as guaranteed by the Fair Housing Act.

157.    The Plaintiffs have suffered deprivation of the statutory rights, emotional distress and mental anguish, embarrassment, humiliation and intimidation sustained as a result of Defendant's discriminatory actions.

## COUNT III

### 42 U.S.C. § 1982

158.    Plaintiffs repeat and reallege paragraphs 1 through 157 as if fully set forth herein.

159.    The Plaintiffs are members of the Jewish race.

160.    The actions by Defendant are violations of the Plaintiffs' right to have the same rights as enjoyed by other citizens to hold and convey real and personal property in violation of 42 U.S.C. § 1982.

161.    The Plaintiffs have suffered deprivation of the statutory rights, emotional distress and mental anguish, embarrassment, humiliation and intimidation sustained as a result of Defendant's discriminatory actions.

## COUNT IV

### New Jersey Law Against Discrimination

### N.J. Stat. Ann. § 10:5-1, *et seq.*

162.    Plaintiffs repeat and reallege paragraphs 1 through 161 as if fully set forth herein.

163.     By denying Plaintiffs, on the basis of race and religion, the opportunity to obtain the accommodations, advantages, facilities, and privileges of ownership of real property, Defendant violated and continues to violate Plaintiffs' rights under the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1, *et seq.*, including N.J. Stat. Ann. § 10:5-4, N.J. Stat. Ann. § 10:5-9.1, and N.J. Stat. Ann. § 10:5-12.

164.     Defendant's conduct has caused significant damage to Plaintiffs.

165.     Defendant is liable for the damage caused to Plaintiffs and should be enjoined from further violating Plaintiffs' rights.

166.     The undersigned certifies that a copy of this Complaint, and accompanying motion for a temporary restraining order have been mailed via first class mail on December 6, 2018, to the New Jersey Office of the Attorney General, Division of Law pursuant to N.J.S.A. 10:5-13.

## COUNT V

### Planned Real Estate Development Full Disclosure Act

### N.J. Stat. Ann. § 45:22A-21, *et seq.*

167.     Paragraphs 1 through Plaintiffs repeat and reallege paragraphs 1 through 166 as if fully set forth herein.

168.     N.J.S.A. 45:22A-44(b) provides: "The association shall exercise its powers and discharge its functions in a manner that protects and furthers the health, safety and general welfare of the residents of the community."

169.     Defendant violated the Planned Real Estate Development Full Disclosure Act, N.J.S.A. 45:22A-44, *et seq.,* by enforcing rules and regulations of the Association that impair Plaintiffs' rights by preventing Plaintiffs from freely exercising their religion and free speech and

by creating an attempting to create new rules, regulations to further prevent Plaintiffs from exercising the religion and free speech.

170.    The Plaintiffs have suffered emotional distress and mental anguish, embarrassment, humiliation and intimidation sustained as a result of Defendant's discriminatory actions including prohibiting them from leaving The Enclave for worship services and from seeing family and friends on the Sabbath.

<u>COUNT VI</u>

**New Jersey Constitution**

**Article I, Paragraph 3**

171.    Plaintiffs repeat and reallege paragraphs 1 through 170 as if fully set forth herein.

172.    The New Jersey Constitution, Article I, Paragraph 3, provides:

> No person shall be deprived of the inestimable privilege of worshipping Almighty God in a manner agreeable to the dictates of his own conscience; nor under any pretense whatever be compelled to attend any place of worship contrary to his faith and judgment; nor shall any person be obliged to pay tithes, taxes, or other rates for building or repairing any church or churches, place or places of worship, or for the maintenance of any minister or ministry, contrary to what he believes to be right or has deliberately and voluntarily engaged to perform.

173.    The New Jersey Supreme Court has imposed New Jersey constitutional principles are upon community associations, including Homeowner Associations.

174.    The actions of Defendant in depriving Plaintiffs of the right to practice their religion is a violation of this provision.  The Plaintiffs have suffered emotional distress and mental anguish, embarrassment, humiliation and intimidation sustained as a result of Defendant's discriminatory actions including prohibiting them from leaving the Enclave for worship services and from seeing

family and friends on the Sabbath, and for a period of time prohibited them from building temporary Sukkahs.

## RELIEF SOUGHT

**WHEREFORE**, Plaintiffs demand Judgment as follows:

A.  Declaratory judgment holding that the actions of the HOA in obstructing free passage of Orthodox Jewish people through the Damiano Way pedestrian gate without the need to use electronic means constitutes interference with their rights under the Fair Housing Act, 42 U.S.C. §§ 3604(b), 3617; 42 U.S.C. § 1982; the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1, *et seq.*; the New Jersey Planned Real Estate Development Full Disclosure Act, N.J. Stat. Ann. § 45:22A-44; and N.J. Const., Art. I, Para. 3;

B.  Declaratory judgment holding that the actions of the HOA in forbidding Orthodox Jewish homeowners from conducting prayer gatherings in their homes constitutes interference with their rights under the Fair Housing Act, 42 U.S.C. § 3604(b), 3617; 42 U.S.C. § 1982; the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1, *et seq.*; the New Jersey Planned Real Estate Development Full Disclosure Act, N.J.S.A. 45:22A-44; and N.J. Const., Art. I, Para. 3;

C.  Preliminary and permanent orders enjoining the HOA to either leave open the Damiano Way gate from two hours before sunset on Fridays to after sunset on Saturdays and for similar times on holy days or to provide access to and from the Damiano Way gate without use of electronic devices;

D.  Preliminary and permanent orders enjoining the HOA to cease and desist from punishing Orthodox Jewish homeowners for conducting prayer gatherings in their homes;

E.  Preliminary and permanent orders enjoining the HOA from restricting Orthodox Jewish homeowners from authorizing guests for more than one day;

F.  Preliminary and permanent orders enjoining the HOA from requiring pedestrian guests of Orthodox Jewish homeowners be accompanied by a homeowner during the Sabbath and on holy days;

G.  An award to Plaintiffs of full costs, disbursements and attorneys' fees, to the extent permitted by law, arising out of Defendant's laws and actions and out of this litigation;

H.  An award to Plaintiffs of nominal and punitive damages; and

I.  Granting such other, further and different relief as to this Court deems just, proper and equitable.

Dated:  December 6, 2018

**STORZER & ASSOCIATES, P.C.**

*/s/ Chris K. Costa*
*/s/ Sieglinde K. Rath*
Chris K. Costa
Sieglinde K. Rath
9433 Common Brook Road
Suite 208
Owings Mills, MD 21117
costa@storzerlaw.com
Tel: (202) 857-9766
Fax: (202) 315-3996

*Attorney for Plaintiffs*

## CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that this matter is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding other than an administrative complaint filed by non-party Nathan N. Reiss with the United States Department of Housing and Urban Development and the New Jersey Department of Law & Public Safety Division of Civil Rights on December 26, 2017, Docket No. HQ14cc-66789, and that no other such action, arbitration or administrative proceeding is contemplated at this time. I do not know of any other party who should be joined in this action.

**STORZER & ASSOCIATES, P.C.**
*/s/ Chris K. Costa*
*/s/ Sieglinde K. Rath*
Chris K. Costa
Sieglinde K. Rath
9433 Common Brook Road
Suite 208
Owings Mills, MD 21117
costa@storzerlaw.com
Tel: (202) 857-9766
Fax: (202) 315-3996

*Attorneys for Plaintiffs*