**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RABBI DAVID SLOMOVITZ, NATHAN FRANKEL, EDWARD HANDLER, SAMUEL LANDY, MIRIAM LEVITZ, HARRY LIEBER, DAVID REICH, ABRAHAM TAUBER, and MORRIS WALDMAN,<br><br>    Plaintiffs,<br><br>   v.<br><br>THE ENCLAVE AT FAIRWAYS HOMEOWNERS ASSOCIATION, INC., a New Jersey Domestic Corporation,<br><br>    Defendant. | Civil No. 3:18-cv-16910 |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF TEMPORARY RESTRAINING ORDER PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 65 AND FOR OTHER RELIEF**

**STORZER & ASSOCIATES, P.C.**
Chris K. Costa
Sieglinde K. Rath
9433 Common Brook Road
Suite 208
Owings Mills, MD 21117
costa@storzerlaw.com
Tel: (202) 857-9766
Fax: (202) 315-3996

*Attorney for Plaintiffs*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iii

FACTUAL BACKGROUND ...............................................................................1

ARGUMENT ......................................................................................................6

I.    This Court Should Grant Plaintiffs' Motion for a Temporary Restraining Order Because the Factors Test for Such Relief Weighs Heavily in Their Favor........................................6

    A.    Plaintiffs Are Likely to Succeed on the Merits.........................................6

        1.    Fair Housing Act, 42 U.S.C. § 3604(b). .....................................7

        2.    Fair Housing Act, 42 U.S.C. § 3617.........................................10

        3.    42 U.S.C. § 1982.....................................................................13

        4.    New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1, *et seq.* .................................................................................14

        5.    N.J. Const., Art. I, Para. 3. ......................................................15

    B.    Plaintiff Will Suffer Irreparable Harm if the Injunction is Denied.......................17

    C.    Granting Preliminary Relief Will Not Result in Greater Harm to the Defendant. 19

    D.    The Public Interest Favors Granting Relief. ..........................................20

CONCLUSION...................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*901 Ernston Rd., LLC v. Borough of Sayreville Zoning Bd. of Adjustment*, No. CV 18-2442, 2018 WL 2176175 (D.N.J. May 11, 2018) ................................................................. 17, 18

*Assisted Living Assocs. of Moorestown, LLC v. Moorestown Twp.*, 996 F. Supp. 409 (D.N.J. 1998) ........................................................................................................................... 18

*Bachman v. St. Monica's Congregation*, 902 F.2d 1259 (7th Cir. 1990) .................................... 13

*Bangerter v. Orem City Corp.*, 46 F.3d 1491 (10th Cir. 1995) ..................................................... 9

*Committee for a Better Twin Rivers v. Twin Rivers Homeowners' Ass'n*, 192 N.J. 344, 929 A.2d 1060 (2007) ..................................................................................................... 15, 16

*Council of Alternative Political Parties v. Hooks,* 121 F.3d 876 (3d Cir. 1997) ........................ 20

*Dublirer v. 2000 Linwood Ave. Owners, Inc.*, 220 N.J. 71, 103 A.3d 249 (2014) ................ 15, 16

*El v. People's  Emergency Center*, 315 F. Supp. 3d 837 (E.D. Pa. 2018) .................................... 9

*Farhi v. Commissioners of Deal*, 204 N.J. Super. 575 (1985) ..................................................... 11

*Fed'n of State Massage Therapy Bds. v. Acad. of Oriental Therapy, LLC*, No. 3:13-cv-06317, 2013 WL 5888094 (D.N.J. Oct. 28, 2013) ................................................................ 6

*Fontaine v. Central Square Condominiums, Inc.*, Civ. A. 99-CV-1756, 2001 WL 34355639 (E.D. Pa. Dec. 28, 2001) ............................................................................................. 14

*Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327 (7th Cir. 2004) .............................................................................................................................. 10

*Harvick v. Oak Hammock Pres. Cmty. Owners Ass'n Inc.*, No. 614CV937ORL40GJK, 2015 WL 12819998 (M.D. Fla. July 22, 2015) ........................................................................ 10

*Housing Rights Center v. Donald Sterling Corp.*, 274 F. Supp. 2d 1129 (C.D. Cal. 2003) ......... 17

*Mehta v. Beaconridge Improvement Ass'n*, 432 F. App'x 614 (2d Cir. 2011) .............................. 9

*Minard Run Oil Co. v. United States Forest Serv.*, 670 F.3d 236 (3d Cir. 2011) .......................... 6

*N.J. Coalition Against War in the Middle E. v. J.M.B. Realty Corp.*, 138 N.J. 326, 650 A.2d 757 (1994), *cert. denied,* 516 U.S. 812 (1995) ............................................................... 16

*Ohana v. 180 Prospect Place Realty Corp.,* 996 F. Supp. 238 (E.D.N.Y. 1998) ........................ 10

*Raab Family Partnership v. Borough of Magnolia*, Civ. No. 08-5050, 2009 WL 361135 (D.N.J. Feb. 13, 2009) .................................................................................................... 18

*Reeves v. Carrollsburg Condominium Unit Owners Ass'n*, No. Civ. A. 96-2495RMU, 1997 WL 1877201 (D.D.C. Dec. 18, 1997) ........................................................................ 14

*ReMed Recovery Care Ctrs. v. Twp. of Willistown*, 36 F. Supp. 2d 676 (E.D. Pa. 1999) ........... 20

*Rogers v. Windmill Pointe Village Club Ass'n, Inc.*, 967 F.2d 525 (11th Cir. 1992) .................. 17

*Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987) ........................................................ 13

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814 (9th Cir. 2001) ............. 17

*State v. Cameron*, 100 N.J. 586 (1985) ..................................................................................... 11

*Tenafly Eruv Ass'n Inc. v. Bourough of Tenafly*, 309 F.3d 144 (3d Cir. 2002) ........................... 20

*Trafficante v. Metro Life Ins. Co.*, 409 U.S. 205 (1972) .............................................................. 7

**Statutes**

42 U.S.C. § 1982 ...................................................................................................................... 6, 13

42 U.S.C. § 3604 ........................................................................................................................... 6

42 U.S.C. § 3617 ...................................................................................................................... 6, 10

N.J. Stat. Ann. § 10:5-1, *et seq.* ................................................................................................ 6, 14

N.J. Stat. Ann. § 10:5-12 ............................................................................................................. 14

N.J. Stat. Ann. § 10:5-4 ............................................................................................................... 14

N.J. Stat. Ann. § 45:22A-44 ........................................................................................................... 6

**Rules**

Federal Rule of Civil Procedure 65 .............................................................................................. 6

**Regulations**

24 C.F.R. § 100.65(b)(4) ............................................................................................................... 7

**Constitutional Provisions**

N.J. Const., Article I, Para. 3 ...................................................................................... 7, 15

## FACTUAL BACKGROUND

On December 6, 2018, Plaintiffs Rabbi David Slomovitz, Nathan Frankel, Edward Handler, Samuel Landy, Harry Lieber, David Reich, Abraham Tauber, Morris Waldman, and Miriam Levitz ("Plaintiffs"), all residents of an active adult over age 55 gated community known as The Enclave at the Fairways ("The Enclave") in Lakewood Township, N.J., Declaration of Nathan Reiss ("Reiss Decl.") ¶ 5,[1] filed their Complaint against Defendant The Enclave at the Fairways, Homeowners Association, Inc. (the "HOA"), alleging violations of the Fair Housing Act, 42 U.S.C. § 1982, and New Jersey law.  Plaintiffs' Complaint arises out of the HOA's actions targeting the Plaintiffs based on their Orthodox Jewish identity.

As the number of homes owned by Orthodox Jews in The Enclave has increased in the last two years,[2] the HOA has taken a series of escalating actions targeting these Orthodox Jewish residents, including preventing them from leaving The Enclave to attend services on the Sabbath and Holy Days; preventing Orthodox Jewish residents from receiving visitors at their homes on such days; discriminatorily enforcing rules about visitors in a way that predominantly if not exclusively obstructs the families and friends of Orthodox Jewish residents from visiting on the Sabbath; and enforcing rules to prevent Orthodox Jewish residents from gathering for prayer

---

[1] Mr. Reiss, not a plaintiff, is the complainant in a proceeding conducted by the New Jersey Attorney General's Division of Civil Rights, which investigated his complaint that the HOA was discriminating on the basis of religious belief in violation of the federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*, and the New Jersey Law Against Discrimination, N.J.S.A. §§ 10:5-1, *et seq.*  Although a settlement agreement with DCR was negotiated, the Defendant refused to sign it. Reiss Decl. ¶¶ 36-37.

[2] All Plaintiffs are practicing Orthodox Jews and residents of The Enclave who purchased their homes since 2016.  *See* Declaration of Rabbi David Slomovitz ("D. Slomovitz Decl.") ¶¶ 1-3; Declaration of Nathan Frankel ("Frankel Decl.") ¶¶ 1-3; Declaration of Edward Handler ("Handler Decl.") ¶¶ 1-2; Declaration of Samuel Landy ("Landy Decl.") ¶¶ 1-2; Declaration of Miriam Levitz ("Levitz Decl.") ¶¶ 1-3; Declaration of Harry Lieber ("Lieber Decl.") ¶¶ 1-3; Declaration of David Reich ("Reich Decl.") ¶¶ 1-2; Declaration of Abraham Tauber ("Tauber Decl.") ¶¶ 1-3; Declaration of Morris Waldman ("Waldman Decl.") ¶¶ 1-2.

1

activity in their homes.  These actions target the Orthodox Jewish residents of The Enclave because of their race and religion and interfere with their exercise of fundamental right to religious freedom.

Significant evidence demonstrates the HOA's hostility toward the Plaintiffs and other Orthodox Jews based on their race and religion.  Rabbi Slomovitz has been labeled a "Jew" in The Enclave's computer system.  M. Slomovitz Decl. ¶¶ 3-8.  Orthodox Jews were required by the Defendant to place a large, brightly colored yellow or orange sheet of paper in their front window in order to have a Sukkah[3] during the Jewish Sukkot holiday--an identification of which homes are owned by Jews--which is demeaning and offensive to them, while no such requirement is enforced for Christmas and Easter decorations.  Frankel Decl. ¶¶ 8-9; Landy Decl. ¶¶ 8 & Exh. A; Lieber Decl. ¶¶ 10-11; Reich Decl. ¶ 11; Tauber Decl. ¶ 10; Waldman Decl. ¶ 9.  Such actions are particularly disturbing given the level of harassment experienced by Plaintiffs at the hands of other residents.  *See also* Reich Decl. ¶ 10 (email sent by Defendant indicating that an event was cancelled "due to the Hanukkah ceremony").  Defendant organized a short-lived neighborhood watch program to monitor and challenge Orthodox Jews entering The Enclave on the Jewish Sabbath.  Reiss Decl. ¶ 35.

Plaintiffs have been harassed by other residents in The Enclave.  Handler Decl. ¶¶ 7-9 (neighbor said they had no right to walk on the sidewalk because they were Orthodox Jews; resident told granddaughter that she did not have the right to be in The Enclave for same reason); Landy Decl. ¶¶ 6-7 (son and children accosted by an Enclave resident who yelled at them because they were Jewish); Levitz Decl. ¶¶ 10-12 (two people sitting in front of residence watching the gate for the entrance of Orthodox Jewish residents and their family and friends); Reich Decl. ¶¶ 8-9 (resident yelled at and took pictures of grandchildren); Waldman Decl. ¶¶ 5-8 (Enclave resident

---

[3] A Sukkah is a temporary hut topped with branches and often decorated with Judaic themes.

yelled "Fucking Jews" and "This place is becoming a zoo," among other statements; people who attended a prayer meeting at his house were harassed, followed and taken photos of by Enclave residents); Reiss Decl. ¶¶ 40-43 (Orthodox Jewish resident told that he "did not belong" in The Enclave; screamed at by resident at an HOA meeting with no action taken by the Board; "booed" at by other residents; and spat upon by a female resident of The Enclave).

Critically, the Defendant's actions in locking a gate, installing metal skirts under the vehicle gate, and building an eight-foot-high solid fence adjacent to the gate located at The Enclave's Damiano Way exit[4] that was used by Plaintiffs to attend worship services and visit with family members on the Sabbath and Holy Days, Reiss Decl. ¶¶ 28-29, 32-33 & Exhs. C, D, F, have effectively barred Plaintiffs from attending synagogues near the Damiano exit and exercising their fundamental right to worship on their Sabbath and other Holy Days because of the hours that the HOA has locked the pedestrian gate.  Frankel Decl. ¶¶ 4-6; Handler Decl. ¶¶ 3-5; Landy Decl. ¶¶ 3-5; Levitz Decl. ¶¶ 8-9; Lieber Decl. ¶¶ 4-9; Reich Decl. ¶¶ 3-5; Tauber Decl. ¶¶ 4-7; Waldman Decl. ¶¶ 3-4.  That pedestrian gate requires the use of an electronic access key, which Orthodox Jews cannot use on the Sabbath and Holy Days.  Reiss Decl. ¶ 8; D. Slomovitz Decl. ¶¶ 4, 6.  The Plaintiffs purchased these homes to be close to their synagogues and families, and they must attend religious services on the Sabbath.  *Id.*; Levitz Decl. ¶¶ 4-6; D. Slomovitz Decl. ¶ 5.  Several Plaintiffs are unable to receive their family members and friends at their homes on the Sabbath and Holy Days because of the Defendant's actions.  Frankel Decl. ¶ 7; Handler Decl. ¶ 6; Reich Decl. ¶ 7; Tauber Decl. ¶¶ 8-9; Waldman Decl. ¶¶ 3-4; Reiss Decl. ¶¶ 44-45.  The Enclave could use a mechanical lock, which Plaintiffs may use, but has chosen not to.  Reiss Decl. ¶ 11.

---

[4] None of these actions were taken with respect to The Enclave's other exit at Massachusetts Avenue, which is distant from Damiano Way and the synagogues attended by Orthodox Jewish residents of The Enclave.  Reiss Decl. ¶¶ 12, 14, 19, 34 & Exh. B.

Currently, despite several efforts by the Orthodox Jewish community and the DCR to have Defendant leave the Damiano pedestrian gate unlocked during the necessary times for that community, Defendant refuses to do so.  Reiss Decl. ¶¶ 38-39.

After some Orthodox Jewish residents walked around the existing tall fence on the Sabbath on November 23 and 24, 2018, The Enclave then immediately extended that fence.  Reiss Decl. ¶¶ 30-31 & Exh. E.  This has now created a critical condition for the Plaintiffs.

There is no security justification for the Defendant's actions, as most of the perimeter of The Enclave just has a simple and easily-crossed two-rail fence.  Reiss Decl. ¶¶ 16-17, 29 & Exh. A.  Further, both exist have video surveillance cameras.  Reiss Decl. ¶ 13.  The pedestrian gate at Damiano exit remained unlocked for approximately eleven years until 2016, when Orthodox Jewish residents began using is to travel to synagogues.  Reiss Decl. ¶¶ 21-22.

The targeting of Plaintiffs and other Orthodox Jews has created great hardship to them with respect to their ability to practice their religion.  Frankel Decl. ¶ 6 (being forced to bend under a gate was "physically difficult and humiliating"); Handler Decl. ¶ 4 (difficult climbing over gate with hip replacement); Landy Decl. ¶ 4 (bending under gate was painful because of back issues); Levitz Decl. ¶ 8 (impossible for husband to move his body over or under the gate); Lieber Decl. ¶¶ 7-8 (forced to stop attending religious services; fears not being able to return home); Reich Decl. ¶ 5 (could only bend under gate with children's help); Tauber Decl. ¶ 5.  Now, there is no more option to pass the gate during hours necessary for Plaintiffs to travel, and the Defendant has placed skirts under the vehicle gate, and eight-foot-high walls adjoining the gate.  Reiss Decl. ¶ 32-33 & Exh. F; Tauber Decl. ¶¶ 5-7; Waldman Decl. ¶ 4.  Plaintiff Handler can no longer attend services at his synagogue.  Handler Decl. ¶ 5; *see also* Waldman Decl. ¶ 4 (cannot fully attend religious services).  It is dangerous for all Plaintiffs (and impossible for some) to walk to services

the lengthy distance around from the other exit on Massachusetts Avenue, where there are no sidewalks, poor lighting, several hills and extremely narrow shoulders.  Landy Decl. ¶ 5; Levitz Decl. ¶ 9 (husband uses walker); Reich Decl. ¶ 7; Reiss Decl. ¶ 15.

Plaintiff Levitz has "generally not used [her] home as a residence since moving" to The Enclave.  Levitz Decl. ¶ 7.

Plaintiff Slomovitz has been further targeted and discriminated against in the exercise of his fundamental rights, being prohibited from having individuals at his home for prayer services as discussed further below.  D. Slomovitz Decl. ¶¶ 7-10.  His membership rights with the HOA have been suspended for illegitimate and illegal reasons, *id.* ¶¶ 11-13, and the word "Jew" is now appended to his name in The Enclave's computer system.  *Id.* ¶ 14; M. Slomovitz Decl. ¶¶ 3-7. He has also been fined $7,675.  D. Slomovitz Decl. ¶¶ 9-10.  Although he is a rabbi, the Defendant has now prohibited him from having a Sukkah.  *Id.* ¶ 17.  He is also forbidden from using the clubhouse, exercise room and pool at The Enclave.  *Id.* ¶ 18.

As a result, the Plaintiffs seek preliminary and permanent orders enjoining Defendant to either leave open the Damiano Way gate from two hours before sunset on Fridays to after sunset on Saturdays and for similar times on Holy Days, or to provide access to and from the pedestrian gate located at The Enclave's exit on Damiano Way ("Damiano pedestrian gate" and "Damiano exit," respectively) without use of electronic devices; enjoining the HOA to cease and desist from punishing Orthodox Jewish homeowners for conducting prayer gatherings in their homes; enjoining the HOA from restricting Orthodox Jewish homeowners from authorizing guests for more than one day; and enjoining the HOA from requiring pedestrian guests of Orthodox Jewish homeowners to be accompanied by a homeowner during the Sabbath and on holy days.

**ARGUMENT**

I.    **This Court Should Grant Plaintiffs' Motion for a Temporary Restraining Order Because the Factors Test for Such Relief Weighs Heavily in Their Favor.**

Under Federal Rule of Civil Procedure 65, this Court may issue a temporary restraining order without notice to the adverse party if

(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

FED. R. CIV. P. 65(b)(1)(A)-(B).  "The decision to issue a preliminary injunction and/or temporary restraining order is governed by the same four-factor test." *Fed'n of State Massage Therapy Bds. v. Acad. of Oriental Therapy, LLC*, No. 3:13-cv-06317, 2013 WL 5888094, at *1 (D.N.J. Oct. 28, 2013).  The Third Circuit has held that in order to obtain such relief, a plaintiff must demonstrate "(1) a likelihood of success on the merits; (2) that [plaintiff] will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Minard Run Oil Co. v. United States Forest Serv.*, 670 F.3d 236, 249-50 (3d Cir. 2011).  As discussed below, all factors weigh in favor of the granting of Plaintiffs' Motion.


A.    <u>Plaintiffs Are Likely to Succeed on the Merits.</u>

Plaintiffs have brought claims under two provisions of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604(b) & 3617; 42 U.S.C. § 1982; the New Jersey Planned Real Estate Development Full Disclosure Act ("PREFDA"), N.J. Stat. Ann. § 45:22A-44; the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1, *et seq.*; and the New Jersey Constitution, Article I,

Paragraph 3. Complaint ¶¶ 150-174. Based on the Defendant's discriminatory treatment of Plaintiffs, this first factor is easily satisfied for each claim.

1. *Fair Housing Act, 42 U.S.C. § 3604(b).*

Under § 3604(b) of the FHA, it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, [or] . . . religion . . . ." Significant to this case, regulations from the United States Department of Housing and Urban Development, which are entitled to "great weight," *Trafficante v. Metro Life Ins. Co*., 409 U.S. 205, 210 (1972), state that § 3604(b) prohibits "[l]imiting the use of privileges, services or facilities associated with a dwelling because of race [or] . . . religion . . . of an owner, tenant or a person associated with him or her." 24 C.F.R. § 100.65(b)(4).

Here, the Defendant interfered with Plaintiffs' use of facilities at the community in numerous ways and are making housing unavailable for Orthodox Jews. First, the Defendant has severely limited Rabbi Slomovitz in his use and enjoyment of The Enclave simply because he invited people to prayer meetings in his basement. D. Slomovitz Decl. ¶¶ 7-8. The HOA has imposed daily fines that have accrued to at least $7,675, deactivated his access card, and suspended his membership rights. D. Slomovitz Decl. ¶¶ 9-10. Furthermore, the HOA has previously allowed people of other faiths to have religious gatherings in their homes. D. Slomovitz Decl. ¶ 21. Defendant has targeted Slomovitz based on his Orthodox Jewish status. When his married children come to visit him by car, they are required to check in at the twenty-four-hour manned guard house and tell the attendant his name. On a recent visit, the word "Jew" was written next to

Plaintiff Rabbi Slomovitz's name in the computer system for The Enclave.  D. Slomovitz Decl. ¶ 14; M. Slomovitz Decl. ¶¶ 5-7.

Next, the HOA has severely and in many instances completely hindered Plaintiffs' ability to exit The Enclave in order to attend worship services outside the community on the Sabbath or other Holy Days.  As Defendant well knows, Plaintiffs are Orthodox Jews and may not use the electronic access cards to exit The Enclave on the Sabbath to attend synagogue.  D. Slomovitz Decl. at ¶ 5.  Until 2016, Orthodox Jewish residents of The Enclave used an unlocked pedestrian gate to walk to their respective synagogues. Frankel Decl. ¶ 5; Levitz Decl. ¶ 8; Lieber Decl. ¶ 5.  That year, the HOA began locking the gate, as discussed in more detail *infra*.  As of November 2018, the Damiano pedestrian gate that residents use to attend worship services is open only from 4:00 p.m. to 8:00 p.m. on Friday night and from 6:00 a.m. to 10:00 a.m. on Saturday morning.  This schedule greatly interferes with the Plaintiffs' ability to attend worship services at synagogues located near the Damiano exit, such that they must seek burdensome and dangerous options for exiting The Enclave, if they can exit at all, also discussed *infra*, since the Damiano gate is generally locked when they attend synagogue.

The Complaint further alleges that Plaintiffs are inhibited from inviting friends and family to their homes during the Sabbath or other Holy Days, which is a privilege of membership, because Defendant has begun enforcing a previously unused and unenforceable policy with regard to pedestrian visitors to The Enclave, requiring them to be accompanied by residents while in The Enclave.  Dkt. #1 ¶ 138.  This burdens visits by the children, grandchildren and friends of Orthodox Jewish residents, since they are unable to contact the residents by phone during the Sabbath, *id.* ¶ 139, and therefore they cannot be met to be accompanied.

The policy for admission of guests has also been changed by the Defendant in a way that further specifically inhibits Orthodox Jewish residents from receiving guests on the Sabbath or Jewish Holy Days. *Id.* ¶ 142. Previously, a homeowner could grant permission for visitors to temporarily access the property by informing the front gate. *Id.* This access included overnight visits. *Id.* Now, such temporary permission is for one day only and expires at midnight each night. *Id.* ¶ 143 This restriction poses an undue and targeted burden upon Orthodox Jewish homeowners, who are not permitted to call the gate to reactivate permission on Saturday or on other Holy Days after midnight, and such permission granted the previous day would "expire." *Id.*

Each of these actions prevents the Plaintiffs from enjoying the privileges, facilities, and services of membership in The Enclave on account of their race and religion, and collectively they demonstrate that the Plaintiffs would be successful on this claim. *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995) ("a plaintiff makes out a prima facie case of intentional discrimination under the FHA merely by showing that a protected group has been subjected to explicitly differential—*i.e.*, discriminatory—treatment."); *El v. People's Emergency Center*, 315 F. Supp. 3d 837, 342 (E.D. Pa. 2018) (Muslim tenant stated discrimination claim under 42 U.S.C.A. § 3604(b) by alleging facts including that his landlord did "not care to have folks of Islamic religion"); *Mehta v. Beaconridge Improvement Ass'n*, 432 F. App'x 614, 617 (2d Cir. 2011) (Indian resident stated claim against community association under 42 U.S.C. 3604(b) when he alleged that association withheld privileges and services from his family that it afforded to white homeowners, engaged in preferential treatment of white homeowners in ground maintenance, and when an association employee made a racial slur).

2.      *Fair Housing Act, 42 U.S.C. § 3617.*

Under 42 U.S.C. § 3617, it is unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004) ("[W]hat is alleged in this case . . . is a <u>pattern</u> of harassment, invidiously motivated, and, because backed by the homeowners' association to which the plaintiffs belong, a matter of the neighbors' ganging up on them. We are far from a simple quarrel between two neighbors or the isolated act of harassment committed by [a] landlord . . . ." (emphasis in original)); *Ohana v. 180 Prospect Place Realty Corp.,* 996 F. Supp. 238, 243 (E.D.N.Y. 1998) ("The peaceful enjoyment of one's home is a root concept of our society.  It is obviously sufficiently pervasive to embrace the expectation that one should be able to live in racial and ethnic harmony with one's neighbors."); *Harvick v. Oak Hammock Pres. Cmty. Owners Ass'n Inc.*, No. 614CV937ORL40GJK, 2015 WL 12819998, at *3 (M.D. Fla. July 22, 2015) ([c]ertainly, nonviolent conduct can also force a person to abandon the enjoyment of a housing right if it is sufficiently severe or pervasive.  This . . . reading of § 3617 to include nonviolent conduct aimed at ousting protected persons from their homes is consistent with the FHA's broad purpose of eliminating segregated communities.").

Here, as discussed above, the Defendant has taken draconian steps to interfere with Rabbi Slomovitz's exercise and enjoyment of his rights under the Fair Housing Act and have threatened further action, accusing him of conducting a "corporate place of worship."  D. Slomovitz Decl. at ¶ 8. But the bylaws do not forbid such activity.  They do not include the term "corporate place of worship," nor do they define it.  D. Slomovitz Decl. at 20.  Under New Jersey law, homeowners

10

have the right to engage in ancillary religious activity in their own homes.  *See, e.g., State v. Cameron*, 100 N.J. 586 (1985); *Farhi v. Commissioners of Deal*, 204 N.J. Super. 575 (1985). Furthermore, the Defendant has previously allowed people of other faiths to have religious gatherings in their homes, and only recently sought to amend its bylaws to specifically to prohibit Rabbi Slomovitz' prayer meetings.  D. Slomovitz Decl. at ¶¶ 21-22.  This clearly evidences a discriminatory motive.

Additionally, the Defendant has engaged in intentional ongoing practices of intimidating, interfering with the housing rights of, and harassing the Plaintiffs by deliberately constructing a growing series of physical barriers to obstruct Orthodox Jewish homeowners and families, including Plaintiffs, from attending religious services.

In March 2016, Orthodox Jewish residents of The Enclave began to use the pedestrian gate at the Damiano entrance to leave The Enclave and walk to services at the nearby synagogues. Reiss Decl. ¶ 22.  In direct response to this, the HOA began locking the Damiano pedestrian gate that very month.  Reiss Decl. ¶ 23.  The HOA had never before locked the pedestrian gate.  Reiss Decl. ¶ 21; Levitz Decl. at ¶ 8.  The Defendant is well aware that Plaintiffs cannot use electronic devices on the Sabbath and other Holy Days, and it began locking the gate as a direct response to Orthodox Jewish homeowners using it to walk to religious services.  Reiss Decl. ¶¶ 22-23; D. Slomovitz Decl. ¶¶ 4-5.

 In the summer of 2017, the Damiano pedestrian gate was permanently locked, with access only permitted for ingress and egress from The Enclave with an electronic card provided to Enclave residents.  Reiss Decl. ¶ 24.  After a threat of a lawsuit, the HOA reopened the gate for only specific times of the day.  Reiss Decl. ¶ 25.  The times that the Damiano pedestrian gate was

11

locked greatly interfered with the schedule of prayers, creating a tremendous burden for the Orthodox Jewish residents.

As of November 2018, the HOA opened the pedestrian gate from 4:00 p.m. to 8:00 p.m. on Friday night and from 6:00 a.m. to 10:00 a.m. on Saturday morning.  Tauber Decl. ¶ 7.  This schedule also greatly interferes with the Plaintiffs' schedule of prayers, as it does not coincide the various synagogues' worship schedules, nor the Plaintiffs' worship schedules.  Reich Decl. ¶ 4; Tauber Decl. ¶ 7; Waldman Decl. at ¶ 4.  Furthermore, in November 2018, the HOA installed metal "skirts" on the auto gate barriers on the Damiano exit in order to prevent pedestrians from ducking under the automobile gate to exit The Enclave. Reiss Decl. ¶ 33; *see* Reich Decl. ¶ 5; Waldman Decl. ¶ 4; Landy Decl. ¶ 4.

Additionally, until approximately mid-2016, the entire Enclave property, including the area around the Damiano exit, was surrounded solely by a low two-rail fence. Reiss Decl. ¶ 16.  Persons could easily pass such fence by climbing between or over the rails.  Reiss Decl. ¶ 17.  Recently, the HOA has now constructed an approximately eight-foot-high solid fence adjoining the Damiano exit, making it impossible to pass.   Reiss Decl. ¶ 28; Tauber Decl. ¶ 6.  Except for the area immediately around the Damiano exit, the rest of the border of The Enclave still only has the low, easily crossable, two-rail fence.  Reiss Decl. ¶ 29.  Since this fencing was not erected around the great majority of the perimeter of The Enclave nor near The Enclave's exit on Massachusetts Avenue ("Massachusetts exit"), Reiss Decl. ¶¶ 29, 34, any claim that such fencing is necessary for "security" reasons is pure pretext.  The only place where people cannot pass The Enclave's fences is the one place Orthodox Jews use to attend Sabbath and other religious services, and where their family members may access The Enclave to visit Orthodox Jewish residents.

In an effort to attend Sabbath services, some Orthodox Jewish residents of The Enclave walked around the high fence on the Sabbath on November 23 and 24, 2018.  Reiss Decl. ¶ 30.  In direct response to this attempt to attend worship services, the HOA further extended the high fence.  Reiss Decl. ¶ 31.  None of these steps have been taken around the Massachusetts exit nor the rest of The Enclave. Reiss Decl. ¶ 34.

It is not a viable option for the elderly Plaintiffs to use the Massachusetts Avenue exit because it is an additional half mile from Plaintiffs' places of worship and requires a dangerous one-mile round trip in the dark on unlit roads with no sidewalks.  Landy Decl. ¶¶ 3, 5;  Reich Decl. ¶ 7; Levitz Decl. ¶ 9; Handler Decl. ¶ 5.

The only way that Plaintiffs could leave The Enclave for worship services on the Sabbath, then, was to duck under the automobile gate barriers at the Damiano Way exits.   This option is now no longer possible since the installation of the skirts.

All of these actions were meant to target the Orthodox Jewish residents of The Enclave.


3.      *42 U.S.C. § 1982.*

Under 42 U.S.C. § 1982, "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

Plaintiffs are likely to prevail on this claim because, as discussed *supra*, the Defendant's actions have targeted the Plaintiffs on the basis of their Jewish status.[5]  *See Fontaine v. Central*

---

[5] As the Supreme Court held:

Jews constituted a group of people that Congress intended to protect.  It is evident from the legislative history of the section reviewed in *Saint Francis College* [*v. Al-Khazraji*, 481 U.S. 604 (1987)]*,* a review that we need not repeat here, that Jews and Arabs were among the peoples then considered to be distinct races and hence

*Square Condominiums, Inc.*, Civ. A. 99-CV-1756, 2001 WL 34355639, at *1 (E.D. Pa. Dec. 28, 2001) (plaintiff's claims that their efforts to purchase a condominium were sabotaged by the condominium association on account of their race in violation of 42 U.S.C. § 1982 survived summary judgment); *Reeves v. Carrollsburg Condominium Unit Owners Ass'n*, No. Civ. A. 96-2495RMU, 1997 WL 1877201, at *8 (D.D.C. Dec. 18, 1997) (denying condominium association's motion for partial summary judgment when plaintiff established that the association "tolerat[ed] and facilitat[ed]" harassment by her neighbors against her on account of her race).  Here, the harassment of Plaintiffs was not merely "tolerated" by the HOA but is in fact being promulgated by it.

### 4.    *New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1, et seq.*

The Defendant has violated Plaintiffs' rights under numerous provisions of the New Jersey Law Against Discrimination.  This statute prevents discrimination in public housing on the basis of race or religious principles.  N.J. Stat. Ann. § 10:5-9.1.  It also provides that "[a]ll persons shall have the opportunity . . .  to obtain all the accommodations, advantages, facilities, and privileges of . . .  real property without discrimination because of race . . . ."  N.J. Stat. Ann. § 10:5-4.  Furthermore, "[t]his opportunity is recognized as and declared to be a civil right."  *Id.*  It also makes it unlawful for any person "[t]o discriminate against any person or group of persons because

---

within the protection of the statute. Jews are not foreclosed from stating a cause of action against other members of what today is considered to be part of the Caucasian race.

*Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617-18 (1987).  *See also Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1261 (7th Cir. 1990) ("And in this sense Jews are members of a distinct race. The civil rights statutes enacted in the period of Reconstruction, in guaranteeing all persons the rights of white citizens, have been held to protect all groups that are "races" in the traditional loose sense, such as Jews and Arabs.").

of race, . . . in the terms, conditions or privileges of the sale, rental or lease of any real property or part or portion thereof or in the furnishing of facilities or services in connection therewith[.]" *Id.* § 10:5-12(g)(2).

Again, the Defendant's actions clearly violate the Plaintiffs' civil rights.  Plaintiffs are unable to obtain the full privileges of holding real property in The Enclave because the HOA has effectively and purposefully locked them inside The Enclave to prevent them from attending religious services or visiting with family and friends on the Sabbath and other Holy Days, and the HOA has targeted Rabbi Slomovitz for religious activities that are not against HOA rules.   Each of these actions reflects discrimination on account of Plaintiffs' race and ultimately shows that Defendant has violated and continues to violate Plaintiff's rights under the New Jersey Law Against Discrimination.

### 5.    *N.J. Const., Art. I, Para. 3.*

Article I, Paragraph 3 of the New Jersey Constitution provides:

No person shall be deprived of the inestimable privilege of worshipping Almighty God in a manner agreeable to the dictates of his own conscience; nor under any pretense whatever be compelled to attend any place of worship contrary to his faith and judgment; nor shall any person be obliged to pay tithes, taxes, or other rates for building or repairing any church or churches, place or places of worship, or for the maintenance of any minister or ministry, contrary to what he believes to be right or has deliberately and voluntarily engaged to perform.

The New Jersey Supreme Court has established that enforcement of the provisions of the New Jersey Constitution is not limited to state action.  Instead, the court held:  "The New Jersey Constitution guarantees a broad affirmative right to free speech.  It bars the government from abridging free speech and also protects "against unreasonably restrictive or oppressive conduct on the part of private entities."  *Dublirer v. 2000 Linwood Ave. Owners, Inc.*, 220 N.J. 71, 103

A.3d 249 (2014) (citations omitted); *see also Committee for a Better Twin Rivers v. Twin Rivers Homeowners' Ass'n*, 192 N.J. 344, 929 A.2d 1060 (2007); *N.J. Coalition Against War in the Middle E. v. J.M.B. Realty Corp.*, 138 N.J. 326, 650 A.2d 757 (1994), *cert. denied,* 516 U.S. 812 (1995).

Plaintiffs can establish that Defendant has violated their right to religious freedom under the New Jersey Constitution.   In the context of free speech restrictions by a homeowners association and a co-op, New Jersey courts initially established a three-part test for balancing property rights of a community association with individual New Jersey State constitutional rights as follows:

> (1) the nature, purposes, and primary use of such private property, generally, its "normal" use, (2) the extent and nature of the public's invitation to use that property, and (3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property.

*Committee for a Better Twin Rivers*, 192 N.J. at 358, 929 A.2d at 1068 (citations omitted).   In *Dublirer*, the court clarified the standard in those instances where the constitutional rights of residents of the common-interest community are imposed upon, as follows:

> For those reasons, we now clarify the standard to evaluate restrictions on the right to free speech and assembly for residents of a private common-interest community. In those instances, courts should focus on "the purpose of the expressional activity undertaken" in relation to the property's use, an inquiry adapted from *Schmid, supra*, 84 N.J. at 563, 423 A.2d 615, and should also consider the "general balancing of expressional rights and private property rights," *see Coalition, supra*, 138 N.J. at 362, 650 A.2d 757. Both standards look to similar factors to determine "the fairness of the restrictions imposed" with regard to the residents' free speech rights. *Twin Rivers, supra*, 192 N.J. at 366-67, 929 A.2d 1060.

*Dublirer*, 220 N.J. at 85.   With this clarified standard, the court established that an association's limitation must be reasonable in scope and allow reasonable alternatives for its residents to express their constitutional rights.   *Id.* at 86-89.

16

When the constitutional standard set forth in *Dublirer* and the predecessor cases cited above are applied to the escalating restrictions on the religious practices of Plaintiffs by the Defendant, it is clear that the Plaintiffs would prevail in their constitutional claim. The Defendant's restrictions are in no way reasonable in scope; instead they have been undertaken with malicious intensity targeted solely against one religious community of residents--the Orthodox Jewish community. Further, the Defendant has not attempted to provide any reasonable alternative or accommodation to allow plaintiffs to express their religious rights. It has done the opposite. As the plaintiffs and other Orthodox Jewish residents have sought other methods to leave The Enclave near the Damiano exit to their houses of worship on the Sabbath, the Defendant has systematically barricaded each alternative access point with a new impassable wall.

B.      Plaintiff Will Suffer Irreparable Harm if the Injunction is Denied.

"[I]rreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes." *Rogers v. Windmill Pointe Village Club Ass'n, Inc.*, 967 F.2d 525, 528 (11th Cir. 1992) (citation omitted); *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) ("[w]e have held that where a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation."); *Housing Rights Center v. Donald Sterling Corp.*, 274 F. Supp. 2d 1129, 1140 (C.D. Cal. 2003) ("[i]rreparable injury is presumed from the fact of discrimination in violation of the Fair Housing Act").

Furthermore, "[m]andatory injunctions are common in FHA . . . cases" since "[b]eyond this Court's inherent judicial authority to issue a preliminary injunction pursuant to Federal Rule 65, [the FHA], . . . authorize[s] courts to grant injunctive relief, either temporary or permanent,

where 'a discriminatory housing practice has occurred or is about to occur.'" *901 Ernston Rd., LLC v. Borough of Sayreville Zoning Bd. of Adjustment*, No. CV 18-2442, 2018 WL 2176175, at *4-*5 (D.N.J. May 11, 2018) (internal quotation marks removed) (quoting 42 U.S.C. § 3613(c)(1)). Courts in the Third Circuit have "followed suit" in this regard. *901 Ernston Rd.*, 2018 WL 2176175, at *4; *Assisted Living Assocs. of Moorestown, LLC v. Moorestown Twp.*, 996 F. Supp. 409, 438-39 (D.N.J. 1998) (finding a presumption of irreparable harm when plaintiff established a strong showing of success on the merits of FHA claim); *Raab Family Partnership v. Borough of Magnolia*, Civ. No. 08-5050, 2009 WL 361135, at *9 (D.N.J. Feb. 13, 2009) (same).

The Defendant has violated Plaintiffs' civil rights, and the Plaintiffs have demonstrated a high likelihood of success on their claims. Plaintiff Lieber has stopped attending religious services outside The Enclave because of the constraints posed by the pedestrian gate hours. Lieber Decl. ¶¶ 6-8. Plaintiff Reich is unable to attend services and return at the times designated by the HOA, and his children and grandchildren are unable to visit him on the Sabbath and Holy Days. Reich Decl. ¶¶ 4, 7. Plaintiff Waldman may not attend worship services under the current hours designated by the HOA. Waldman Decl. ¶ 4. Plaintiff Levitz is unable to use her home as a residence, to attend synagogue from her home, or to entertain visits from her children--all of which were the primary reasons she originally purchased her home. Levitz Decl. ¶¶ 4-9. Plaintiff Tauber is unable to attend synagogue at his regular hours and his children and grandchildren are precluded from visiting him on the Sabbath and Holy Days. Tauber Decl. ¶¶ 7-9. The reason Plaintiff Frankel purchased his home was that the pedestrian gate was not locked, and he could attend worship services; he now has considerable trouble attending synagogue and entertaining visitors on the Sabbath and Holy Days due to the time constraints posed by the pedestrian gate. Frankel Decl. ¶¶ 5-7. Plaintiff Landy is unable to leave The Enclave to attend religious services. Landy Decl.

¶¶ 4-5.  Finally, Plaintiff Handler is no longer able to attend services at his synagogue or to receive his family as guests.  Handler Decl. ¶¶ 5-6.

It is abundantly clear that the Plaintiffs have suffered irreparable harm and will continue to do so if this Court fails to grant a preliminary injunction, especially given that Hanukkah celebrations are this weekend and Plaintiffs desire to attend special services for this occasion. This factor thus heavily favors the Plaintiffs.

C.    <u>Granting Preliminary Relief Will Not Result in Greater Harm to the Defendant.</u>

If this Court grants a preliminary injunction in favor of the Plaintiffs, the Defendant will not be harmed in any way.  Plaintiffs simply ask for an order that Defendant cease enforcement of policies and engaging in conduct that discriminates against Orthodox Jews, violates statutory provisions, and suppresses religious freedom.

With respect to the requested order to open the Damiano pedestrian gate during the Sabbath, any alleged concern about "security" is belied by its inconsistent conduct.  It only began locking this gate in March 2016, after more Orthodox Jewish residents began to use it to attend religious services.  Reiss Decl. ¶ 23.  It then built high fencing around the Damiano exit, preventing people from climbing over the fences at that location.  Reiss Decl. ¶ 28; Tauber Decl. ¶ 6.  Such fencing was not intended for security or privacy because it has not been erected around the great majority of the perimeter of The Enclave, nor does it exist near the Massachusetts exit.  Reiss Decl. ¶¶ 29, 34.  The lack of any harm to the Defendant thus weighs in favor of granting a preliminary injunction.

D.    The Public Interest Favors Granting Relief.

Finally, "[t]he public interest in the protection and enforcement of civil rights and anti-discrimination laws generally weighs in favor of granting injunctive relief against violations." *ReMed Recovery Care Ctrs. v. Twp. of Willistown*, 36 F. Supp. 2d 676, 688 (E.D. Pa. 1999) (citing *Oxford House-Evergreen v. Plainfield,* 769 F. Supp. 1329, 1345 (D.N.J. 1991)); *Tenafly Eruv Ass'n Inc. v. Bourough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002) (quoting *Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 884 (3d Cir. 1997) ("where there are no societal benefits justifying a burden on religious freedom, 'the public interest clearly favors the protection of constitutional rights.'")).

In this case, Plaintiffs seek a preliminary injunction that will protect its civil rights and prevent discrimination--principles that the public interest always supports.  This factor thus favors granting a temporary restraining order in this case.

**CONCLUSION**

Based upon the foregoing, Plaintiffs respectfully request that this Court grant their motion for a temporary restraining order.

Dated: December 6, 2018                    **STORZER & ASSOCIATES, P.C.**
                                           */s/ Chris K. Costa*
                                           Chris K. Costa
                                           Sieglinde K. Rath
                                           9433 Common Brook Road
                                           Suite 208
                                           Owings Mills, MD 21117
                                           costa@storzerlaw.com
                                           Tel: (202) 857-9766
                                           Fax: (202) 315-3996

                                           *Attorney for Plaintiffs*